**EXHIBIT 5**

1

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2
    ------------------------------------------x
 3  JORDAN CORPORAN, on behalf of himself
    and all other persons similarly situated,
 4
                            Plaintiffs,
 5
                                    Case No. 21-cv-05069-CS
 6      -vs-

 7  REGENERON PHARMACEUTICALS, INC.,

 8                          Defendant.

 9  ------------------------------------------x

10                                  United States Courthouse
                                    White Plains, New York
11
                                    January 24, 2022
12                                  3:30 p.m.

13
                    ** VIA TELECONFERENCE **
14
    B e f o r e:
15                                  HONORABLE CATHY SEIBEL

16                                  United States District Judge

17
    A P P E A R A N C E S:
18
    LAW OFFICE OF PETER A. ROMERO, PLLC
19      Attorneys for Plaintiffs
    BY:  DAVID D. BARNHORN
20       PETER A. ROMERO

21

    LITTLER MENDELSON, P.C.
22      Attorneys for Defendant
    BY:  CRAIG R. BENSON
23       ELI Z. FREEDBERG

24

25
```

1                THE DEPUTY CLERK:  Good afternoon, Judge.  Judge, this
2    matter is Corporan v. Regeneron Pharmaceuticals.  We have on the
3    line representing plaintiff, Mr. David Barnhorn and Mr. Peter
4    Romero, and representing defendant, we have Mr. Craig Benson and
5    Mr. Eli Freedberg.  Our court reporter, Darby, is on, and Ryan
6    is on.
7                THE COURT:  All right.  Good afternoon, everybody.
8    Let me remind you, when you speak, the first word out of your
9    mouth should be your last name.  Do not say, "This is David
10   Barnhorn for plaintiff."  Just say "Barnhorn" so that the court
11   reporter and I both know right up front who is speaking.  If you
12   forget to do that, you are probably going to get interrupted,
13   which of course you don't want.  So please remember to say your
14   last name and only your last name first when you speak, and that
15   goes even if you think it's clear from the context who is
16   speaking or even if I direct a question right to you.  So thanks
17   in advance for that.
18               I have defendant's partial motion to dismiss.  Is
19   there anything either side would like to add that's not covered
20   by the motion papers?
21               MR. ROMERO:  Romero.  Not from plaintiff's
22   perspective, Your Honor.
23               MR. FREEDBERG:  Freedberg.  Your Honor, we did file a
24   notice of supplemental authority to bring to the Court's
25   attention a case that's directly on point to our standing

1  argument. The case was decided on Friday, so we filed it as
2  soon as we could this morning. I don't know if Your Honor has
3  had a chance to look at it, but we did.
4         THE COURT: I saw it.
5         MR. FREEDBERG: Okay. And I know plaintiffs did file
6  a request to file a sur-reply that was denied. I apologize if
7  filing the notice of supplemental authority was presumptuous,
8  but because it did directly refer, we decided to file it.
9         THE COURT: Do you want to respond to anything in the
10 case that defendant submitted, Mr. Romero?
11        MR. ROMERO: Well, we believe that it's wrongly
12 decided, Your Honor, with all due respect to Judge Seybert. The
13 case primarily relies upon the *TransUnion* and the *Maddox* case,
14 both of which involve types of harm that are substantially
15 different than the type of harm involved here. They were
16 speculative cases based on reputational harm that might arise in
17 the future as the result of, in one instance, inaccurate
18 information in a credit report that was never disclosed for one
19 group of class members in the *TransUnion* case.
20        THE COURT: Well, let me interrupt you. I understand
21 why *TransUnion* and *Maddox* are different, but why is *Rosario*
22 different? That's Judge Seybert's decision.
23        MR. ROMERO: Right, well, I think it's -- I think it's
24 just wrongly decided. It fails to recognize that distinction
25 between the types of harm alleged by the plaintiffs in the

1  *Maddox* and the *TransUnion* cases and the type of harm alleged by
2  plaintiff here and in *Rosario*, which both involve the temporary
3  deprivation of money to which the plaintiff and class members
4  were undisputedly entitled, and if you look at the decision of
5  Judge Cote in the Southern District in the *Porsch case versus*
6  *LLR, Inc.*, it's clear that temporary deprivation of money to
7  which you are entitled leads to proper standing for Article III
8  purposes.  There is no doubt about that.  There are other cases
9  that say that as well.
10            THE COURT:  Well, do we know if Judge Cote would feel
11 the same way post *TransUnion*?  That was a 2019 case.
12            MR. ROMERO:  I believe that *TransUnion* wouldn't change
13 the Court's view on that because, again, this isn't reputational
14 harm.  It's not speculative about what might happen.  It's about
15 something that, in fact, did happen that nobody -- that's
16 completely undisputed.
17            THE COURT:  All right. Well --
18            MR. ROMERO:  Another -- you know, another way of
19 looking at this as well, Your Honor, is, you know, nobody
20 questions in an FLSA overtime case whether the plaintiff has
21 standing to sue.  It's recognized that the harm that stems from
22 not being paid the wages that you are owed at the time that you
23 are owed leads to a justiciable harm.
24            THE COURT:  Being deprived of money is an easy one.
25 The part that's a little harder is at the time that you are

1  supposed to be paid.
2         Your client, as I understand it, at least in the claim
3  that we are discussing here, is not alleging that he didn't get
4  his check.  He is just saying he got it late.  So it's not the
5  same as somebody who is saying, I was paid 20 bucks an hour, but
6  I was supposed to be paid 30.  I mean, that's an easy case.
7         In any event, I am ready to rule.  Thank you.
8         It's a partial motion to dismiss.  I am assuming the
9  parties are familiar with the facts, so I will refer to them as
10 needed, but I am not going to recite them here.
11        The procedural background is pretty simple.  Plaintiff
12 filed this lawsuit on June 8th of this last year.  August 6th
13 defendant filed a pre-motion letter.  Plaintiff responded.  We
14 had a pre-motion conference on September 9th, and this motion
15 followed.  The motion seeks dismissal both for lack of subject
16 matter jurisdiction, specifically standing, and for failure to
17 state a claim.
18        A federal court has subject matter jurisdiction over
19 cause of action only when it has authority to adjudicate the
20 cause pressed in the complaint.  Determining the existence of
21 subject matter jurisdiction is a threshold inquiry, and a claim
22 is properly dismissed for lack of subject matter jurisdiction
23 under Rule 12(b)(1) when the district court lacks the statutory
24 or constitutional power to adjudicate it.  When jurisdiction is
25 challenged, the plaintiff bears the burden of showing by a

1  preponderance of the evidence that subject matter jurisdiction
2  exists, and the Court may examine evidence outside the pleadings
3  to make this determination.
4          That's all from *Arar versus Ashcroft*, 532 F.3d 157 at
5  158.  The Court has to take the facts alleged in the complaint
6  as true and draw all reasonable inferences in favor of the
7  plaintiff, but jurisdiction must be shown affirmatively, and
8  that is not done by drawing from the pleading inferences
9  favorable to the party asserting it.  *Morrison versus National*
10 *Australian Bank*, 547 F.3d 176 at 170, affirmed on other grounds,
11 561 U.S. 247.
12         When a defendant moves to dismiss both for lack of
13 subject matter jurisdiction and for failure to state a claim,
14 the Court has to address subject matter jurisdiction first.  See
15 *Rhulen Agency versus Alabama Insurance*, 896 F.2d 674 at 678.
16         I won't take the time to spell out the requirements
17 for surviving a motion to dismiss for failure to state a claim
18 under Rule 12(b)(6).  We are all familiar, or should be
19 familiar, with the plausibility standards of *Bell Atlantic*
20 *versus Twombly*, 550 U.S. 544, and *Ashcroft versus Iqbal*, 556
21 U.S. 662.
22         The motion here focuses on plaintiff's third cause of
23 action, which is alleged -- which alleges that Regeneron paid
24 him on a biweekly rather than weekly basis in violation of
25 Section 191(1)(a)(i) of the New York Labor Law.  Section

1  191(1)(a) states that a manual worker should be paid weekly and
2  not later than seven calendar days after the end of the week in
3  which the wages are earned unless the Commissioner of the New
4  York Department of Labor has authorized the employer to pay the
5  worker less frequently.
6           Defendant argues that the claim has to be dismissed
7  because there is no private right of action under the statute
8  for employees who do not have a claim for unpaid wages, and that
9  the plaintiff lacks Article III standing to bring the claim.
10 The latter relates to jurisdiction, so I will take that one
11 first.
12          Article III of the Constitution limits a federal
13 court's jurisdiction to actual cases and controversies.  That's
14 at Article III Section 2 Clause 1.  See *Lujan versus Defenders*
15 *of Wildlife*, 504 U.S. 555 at 559.  "Constitutional standing is
16 the threshold question in every federal case determining the
17 power of the court to entertain the suit."  See *Liebovitz versus*
18 *New York City Transit Authority*, 252 F.3d 179 at 184.  "Whether
19 a plaintiff has standing depends on the nature and source of the
20 claims asserted and is determined by whether the constitutional
21 or statutory provision on which the claim rests properly can be
22 understood as granting a right to judicial relief."  *E.M. versus*
23 *New York City Department of Education*, 758 F.3d 442 at 450.
24 There are three constitutional standing requirements that every
25 plaintiff must satisfy to invoke the jurisdiction of the federal

1  courts:  One, an injury in fact that is a concrete and
2  particularized invasion of a legally protected interest; two,
3  causation, that is, a fairly traceable connection between the
4  alleged injury in fact and the alleged conduct of the defendant;
5  and three, redressability.  In other words, that it's likely and
6  not merely speculative that the plaintiff's injury will be
7  remedied by the relief plaintiff seeks in bringing suit.  *Sprint*
8  *Communications versus APCC*, 554 U.S. 269 at 273 to 274.  These
9  minimum requirements exist in all cases separate and apart from
10 whatever statutory requirements may exist in the laws under
11 which plaintiff has filed suit.  See *Alliance for Environmental*
12 *Renewal versus Pyramid Crossgates*, 436 F.3d 82 at 85 to 86.  The
13 party invoking federal jurisdiction bears the burden of
14 establishing that it has standing to do so.  *Lujan* at 561.
15          Regeneron's standing challenge focuses on the injury-
16 in-fact inquiry.  *TransUnion versus Ramirez*, 141 Supreme Court
17 2190 at 2204, explains that a concrete harm must have a close
18 relationship to a harm traditionally recognized as providing a
19 basis for a lawsuit in American courts.  Tangible harms,
20 including monetary harms, are among those that readily qualify
21 as concrete injuries under Article III.  That's *TransUnion* at
22 2204.  It goes on to say that intangible harms, such as
23 reputational harm, may also be concrete provided they satisfy
24 the close relationship test in "which the inquiry is whether
25 plaintiffs have identified a close historical or common law

1  analogue for their asserted injury."  Again, that's *TransUnion*

2  at 2204.  See *Maddox versus Bank of New York Mellon,* 5347004 at

3  page 4, Second Circuit, November 17, 2021.

4           While the Supreme Court and the Second Circuit have

5  not directly ruled on the issue, district courts within this

6  Circuit have found that, "Temporary deprivation of money to

7  which a plaintiff has a right constitutes a sufficient injury in

8  fact to establish Article III standing."  That's *Porsch versus*

9  *LLR*, 380 F.Supp.3d 418 at 424, a Southern District Case in 2019,

10 the one we discussed a moment ago.  To the same effect is *Caul*

11 *versus Petco*, 2021 Westlaw 4407856 at page 4, an Eastern

12 District case from September 27th of last year in which Judge

13 Kovner, addressing Section 191(1)(a)(i), found that temporary

14 deprivation of money is sufficient to establish standing.

15          These results are based on the accounting principle

16 that a dollar today is worth more than a dollar tomorrow.

17 *Atlantic Mutual versus Commissioner*, 523 U.S. 382 at 383.  See

18 *Habitat Education Center versus U.S. Forest Service*, 607 F.3d

19 453 at 457, a Seventh Circuit case from 2010, which said that,

20 "Every day that a sum of money is wrongfully withheld, its

21 rightful owner loses the time value of the money."  A delay in

22 receiving money due, even a temporary one, is particularly felt

23 by workers such as plaintiff "who are generally dependent on

24 their wages for sustenance."  *Vega versus CM & Associates*, 107

25 N.Y.S.3d 286 at 289, a First Department case from 2019.  This is

1  because where an employee loses the use of his money, it affects
2  his ability to pay bills, buy food, medicine or gasoline,
3  participate in savings and investment opportunities, and that's
4  true whether or not the wages are never paid, partially paid, or
5  as here, paid late.  See *Vega* at 288, note 2.
6          I, therefore, find that plaintiff here alleges a
7  concrete harm sufficient for Article III standing.
8          Defendant's arguments that this harm is not
9  sufficiently concrete because the statutory scheme within the
10 Labor Law permits employers to pay many types of employees,
11 including manual workers, on a biweekly basis, and because the
12 Department of Labor allows some manual laborers to be paid
13 biweekly if they get a waiver, do not convince me otherwise.
14 Indeed, such arguments support the notion that both the
15 legislature and Department of Labor understand that certain
16 categories of workers are harmed by being paid biweekly rather
17 than weekly or else there would be no need for such waiver
18 requirements and no need for such enumerated exempted statutory
19 categories to exist.
20         There is no question that the time value of the money
21 at issue here is minimal, given how low interest rates were in
22 the timeframe of 2018 to 2021, which was the period within which
23 plaintiff alleges his paychecks were delayed by a week 26 times
24 each year.  The actual damages here are next to nothing, but
25 they are not nothing, and they are concrete.  So plaintiff has

1  standing.  Whether it would be reasonable or comport with due
2  process for the remedy to be astronomically more than the lost
3  value, such as liquidated damages in the amount of the delayed
4  paycheck, is for another day.
5        I did consider Judge Seybert's *Rosario* decision from
6  Friday, and it gave me some pause, but ultimately doesn't change
7  my view.  Judge Seybert does not disagree with Judge Kovner's
8  decision in *Caul*, but thinks the plaintiff has to allege
9  specifically how the lost value of the money or the lost access
10 to the money hurt him.  In other words, she thinks he has to
11 plead that he would have invested the money or otherwise used
12 it.
13       I find it plausible that a low-wage worker, which
14 plaintiff presumably is, as he claims to be a manual worker at
15 the lowest rank of his job, lives paycheck to paycheck, and
16 people who live paycheck to paycheck are plausibly harmed by not
17 getting their paychecks timely.  We will see what develops on
18 summary judgment.  If it turns out that plaintiff's checking
19 account never dipped below a healthy level, for instance, maybe
20 dismissal will be appropriate then.
21       I could require plaintiff to amend as Judge Seybert
22 did, but because this case is going to discovery anyway, I think
23 we can just await summary judgment.
24       Again, I would note that a remedy equal to the amount
25 of the delayed paycheck for each week would seem to me to be

1  insanely out of the proportion, but that's an issue for another
2  day.
3         Having found that standing exists, defendant argues
4  the third cause of action nevertheless has to be dismissed
5  because the Labor Law only provides a private right of action
6  for employees asserting claims for unpaid wages as opposed to
7  delayed payment of wages.  Section 1981(1-a) of the Labor Law is
8  the statutory provision that lays out the private right of
9  action for "wage claims based upon violations of one or more of
10 the substantive provisions of Labor Law Article 6."  *Gottlieb*
11 *versus Kenneth D. Laub & Co.*, 82 N.Y.2d 457 at 459.  That
12 section says, "In any action instituted in the courts upon a
13 wage claim by an employee or the commissioner in which the
14 employee prevails, the court shall allow such employee to
15 recover the full amount of any underpayment.  All reasonable
16 attorney's fees, prejudgment interest as required under the
17 civil practice law and rules, and unless the employer provides a
18 good faith basis to believe that its underpayment was in
19 compliance with the law, an additional amount as liquidated
20 damages equal to one hundred percent of the total amount of the
21 wages found to be due..."
22         The crux of Regeneron's argument is that because this
23 provision refers only to the underpayment of wages, where a
24 plaintiff concedes that all wages were paid, but supposedly paid
25 untimely, the statute affords no private right of action and no

1  basis for a recovery.  That's in ECF number 20 at page 5.
2              When deciding a question of state law like the one at
3  issue here, a federal court looks to the state's decisional law,
4  as well as to its constitution and statutes.  *Chufen Chen versus*
5  *Dunkin'*, 954 F.3d 492 at 497.  Where there is no clear directive
6  from the state's highest court, federal courts must, "predict
7  how the state's highest court would resolve the uncertainty or
8  ambiguity."  That's *Chufen Chen* at 499.  In doing so, the
9  federal court is bound to apply the law as interpreted by a
10 state's intermediate appellate courts unless there is persuasive
11 evidence that the state's highest court would reach a different
12 conclusion.  *V.S. versus Muhammad*, 595 F.3d 426 at 432.
13             While the New York Court of Appeals has yet to decide
14 the issue, the Appellate Division First Department has held,
15 contrary to Regeneron's position, that the Labor Law permits
16 employees to seek liquidated damages for untimely payments of
17 wages, even if such wages are later paid in full.  That's *Vega*
18 *versus CM*, which I cited earlier 107 N.Y.S.3d 286.
19             The Appellate Division explained at page 288 that an
20 underpayment for purposes of Section 198(1-a) means the act of
21 paying less than what is normal or required, and that this is --
22 and that this is what occurs the moment that an employer fails
23 to pay wages in compliance with Section 191(1)(a).  The court
24 noted that while an employer who eventually pays the employee
25 the underpaid wages can assert an affirmative defense based on

1  that eventual payment, an employee could still seek statutory

2  remedies, including liquidated damages for the initial

3  underpayment.  *Vega* also relied on the Court of Appeals'

4  decision in *Gottlieb* which said that 198(1-a) applies to

5  violations of Article 6, which in turn includes 191(1)(a).

6  That's all in *Vega* at 288, citing *Gottlieb*, 82 N.Y.2d at 463.

7            While Regeneron cites several cases that interpreted

8  the provision differently, all of them either predate or did not

9  consider *Vega*.  Since *Vega* was decided in 2019, every court in

10 this Circuit to consider the decision appears to have followed

11 it.  See, for example, *Caul versus Petco*, 2021 Westlaw 4407856,

12 pages 2 to 3, Judge Kovner's decision; *Rodriguez versus Lowe's*,

13 2021 Westlaw 3848268 at page 5, Eastern District, August 27,

14 2021; *Mabe versus Walmart*, 2021 Westlaw 1062566 at page 5,

15 Northern District, March 18, 2021; *Sorto versus Diversified*

16 *Maintenance*, 2020 Westlaw 7693108 at pages 2 to 3, Eastern

17 District, December 28, 2020; *Duverny versus Hercules Medical*,

18 2020 Westlaw 1033048 at pages 5 to 6, Southern District

19 March 3rd, 2020; and *Scott versus Whole Foods*, 2020 Westlaw

20 9814095 at page 3, Eastern District, February 5th, 2020.

21           Defendant presents no compelling reasons for me to

22 buck this trend and reject *Vega's* conclusions that an employer's

23 late payment of full wages is an underpayment within the terms

24 of Section 198(1-a), and I find that decision, and the logic of

25 other courts within this Circuit applying it, to be well-

1  reasoned and persuasive.  Defendant offers no "persuasive
2  evidence that the state's highest court would reach a different
3  conclusion."  *Muhammad*, 595 F.3d at 452.  So I am bound to apply
4  the law as interpreted by the First Department in *Vega.*
5          Finding that the Labor Law provides a private right of
6  action for the third cause of action, the motion is denied.  I
7  don't reach the arguments about the absence of an implied right
8  of action.
9          So the motion is denied.  The clerk should terminate
10 motion number 18, and now we need to talk about a schedule for
11 discovery.
12         I assume the parties have not had that conversation
13 yet or maybe you have because there is going to be discovery
14 either way.  Have you talked about it?
15         MR. ROMERO:  Romero.  No, we have not, Your Honor.
16         THE COURT:  All right.  Is there any reason why the
17 customary six months would not suffice?
18         MR. ROMERO:  Romero.  I believe that would suffice.
19         MR. FREEDBERG:  Freedberg.  The six months should
20 suffice.  I would probably -- having not given it a lot of
21 thought, and I apologize -- I would probably ask for a
22 bifurcated discovery schedule.
23         Plaintiffs have pled this as a class action, so often
24 what we try to do is see -- you know, get discovery on class
25 issues and then have plaintiffs move for class certification and

```
 1  then engage in full-blown discovery if class certification is

 2  granted.  But I confess, I haven't given it a whole lot of

 3  thought, Your Honor.

 4            THE COURT:  What's your view on that, Mr. Romero?

 5            MR. ROMERO:  We would be amenable to that, Your Honor.

 6            THE COURT:  So --

 7            (Interruption)

 8            THE COURT:  There is a lot of noise in my chambers.

 9            (Pause)

10            THE COURT:  I'm sorry, counsel.  We are going to have

11  to continue this another time.  Somebody in chambers is sick,

12  and I need to attend to that.  We will reach out to you with a

13  new date.  Okay?

14            MR. FREEDBERG:  Thank you, Your Honor.  I hope

15  everyone feels better.

16            THE COURT:  Thanks.

17            (Time noted:  3:57 p.m.)

18

19

20

21

22

23

24

25
```